UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
M.S. and M.D. *on behalf of* B.D.S.,

                    Plaintiffs,

        -against-

NEW HYDE PARK-GARDEN CITY PARK UNION
FREE SCHOOL DISTRICT,

                  Defendant.
-----------------------------------------------------------------X

**REPORT AND
RECOMMENDATION**
20-CV-3380 (JMA) (ARL)

**LINDSAY, Magistrate Judge:**

On July 28, 2020, the plaintiffs, M.S. and M.D., on behalf of their son B.D.S., commenced this action pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.,* the pertinent implementing regulations promulgated under the Code of Federal Regulations, § 300.342 *et seq.,* Article 89 of the New York State Education Law, Section 504 of the Rehabilitation Act of 1973 and Part 200 *et seq.* of the Commissioner of Education's Regulations, against the defendant, New Hyde Park-Garden City Park Union Free School District (the "District"). The plaintiffs seek to set aside a decision of the New York State Education Department Office of State Review ("SRO") dated April 3, 2020, which determined that the District had offered B.D.S. a Free Appropriate Public Education ("FAPE") for the 2019-2020 school year and, thus, denied the plaintiffs' request to be reimbursed for the cost of B.D.S.' tuition at The Gersh Academy ("Gersh") for that year. Before the Court are the parties' cross motions for summary judgment on referral from District Judge Azrack. For the reasons set forth below, the undersigned respectfully recommends that the defendant's motion be granted and the plaintiffs' motion be denied.

## BACKGROUND

B.D.S. is a nine-year-old boy who has been diagnosed with Autism Spectrum Disorder Level 3 and an Intellectual Disability.[1] Ex. P-E.  B.D.S. has a history of maladaptive behaviors including self-injury (biting his right hand), pica (mouthing inedible objects), aberrant self-stimulation and impulsivity.  Exs. P-C - P-H, P-Q, P-R.  At two, B.D.S. had an early intervention evaluation, which led to his receipt of speech and language therapy, occupational therapy and in-home services from a special education teacher.  Ex. P-E.  As a preschooler, B.D.S. attended the Nassau BOCES Children's Readiness Center ("CRC") and was assigned to a self-contained special education preschool program with a 6:l:2 ratio.  Ex. P-E, Tr. 404-05.  He was also taken out of class twice weekly for speech and language therapy and was taught to use a Picture Exchange Communication System ("PECS").  Ex. P-E.  However, according to the plaintiffs, B.D.S. regressed while he attended CRC.  Ex. P-E; Tr. 404-05, 871.  Among other things, B.D.S. lost the ability to use sign language and his self-injurious behaviors increased.  Tr. 873.

For this reason, during his second year at CRC, the District, with the plaintiffs' consent, explored other options for B.D.S.  Tr. 404-09.  Specifically, the District's Committee on Special Education ("CSE") attempted to determine the least restrictive setting to appropriately meet B.D.S.'s needs and concluded that the District's then existing intensive needs program (an 8:1:2 class) did not provide the level of support that B.D.S. required.  Tr. 405.  Accordingly, the CSE agreed to send out applications for the 2016-2017 school year to other local public schools and to approved private schools that provided autism-specific programs.  *Id.*  Unfortunately, none of the

---

[1] For ease of reference, ECF No. 10 is the State Court Administrative Record.  The undersigned will refer to the transcript of the impartial hearing contained in that record as "Tr."  Citations to the exhibits submitted by the plaintiffs and the defendant are referred to as "P-" and "D-" followed by the designated exhibit letter or number. ECF No. 1-3 is a copy of the Decision of the State Review Officer.  ECF No. 1-4 is a copy of the Findings of Fact and Decision of the Impartial Hearing Officer.
.

programs accepted B.D.S. or had an immediate opening for him. *Id.* As a result, from September through October 2016, B.D.S was placed by the plaintiffs at a private school in Manhattan called Comprehensive Kids Development School ("Comprehensive Kids"). Tr. 405-06. Since the District had been unable to locate an opening at an appropriate public school or State-approved private school, the District agreed to pay for B.D.S.'s tuition at Comprehensive Kids. Tr. 406.

Unfortunately, Comprehensive Kids unexpectedly closed in October 2016. *Id.* The CSE immediately convened to discuss an alternative placement for B.D.S. and offered to provide him with in-home services while it sent out packets in order to secure a placement for the remainder of the 2016-2017 school year. Tr. 406-07. But, at the plaintiffs' request, the District agreed to pay for B.D.S to attend Gersh while it continued to search for a new program rather than have him home schooled. Tr. 407. It did so despite the fact that Gersh is not a State-approved special education school. Tr. 585. Nonetheless, pursuant to the agreement, B.D.S. began attending Gersh in December 2016. Tr. 407. According to the plaintiffs, upon entry to Gersh, B.D.S. was functionally non-verbal and entirely self-directed. Ex. P-G; Tr. 873.

Five months later, on May 19, 2017, the CSE met to review B.D.S's progress and to make recommendations for the 2017-2018 school year. Ex. P-C. After hearing from B.D.S.'s special education teacher, a behavioral consultant for the plaintiffs, a special education teacher from the District, a speech therapist from Gersh, an occupational therapist, a physical therapist, a psychologist and a neuropsychologist, the CSE recommended that B.D.S. be placed in a 6:1:3 ratio intensive needs special class program at the District's Hillside Grade School that was scheduled to commence in September 2017. *Id.* The recommendation included the use of Applied Behavior Analysis ("ABA"), including discrete trial rotations and the support of a Board

Certified Behavior Analyst ("BCBA").  *Id*.  B.D.S. was also to be provided with a 1:1 aide, speech therapy, physical therapy, occupational therapy, adaptive physical education and behavioral intervention services.  *Id*.  At the time, the parties also discussed the possibility of the District paying for B.D.S. to continue at Gersh for the summer of 2017 before the 6:1:3 program was due to open, but the plaintiffs wanted to place B.D.S. in camp for the summer.  Tr. 409-10. In any case, the plaintiffs disagreed with the CSE's overall recommendations feeling that B.D.S. might regress if he was moved to another setting.  *Id*.  For that reason, the plaintiffs unilaterally enrolled B.D.S. at Gersh for the 2017-2018 school year.  *Id*.

On September 11, 2017, the plaintiffs filed a due process complaint seeking tuition reimbursement for the 2017-2018 school year.  *Id.; see also* ECF No. 1-6.  They filed an amended due process complaint on October 30, 2017.  ECF No. 1-6.  On September 5, 2018, Leah H. Murphy, Esq, the Impartial Hearing Officer, ruled that the plaintiffs were entitled to tuition reimbursement for the 2017-2018 school year because B.D.S. had not been offered a FAPE for that year.  *Id*.  The District appealed the decision.  *See* ECF No. 1-5.  On November 17, 2018, the SRO dismissed the District's appeal finding that it had failed to establish that its recommended placement would have provided B.D.S. FAPE for the 2017-2018 school year.  *Id*. The SRO focused, in part, on the fact that the District was unable to implement the 6:1:3 special class placement and related services for summer of 2017 since the program was not going to be available until the fall.  *Id*.  The SRO acknowledged that the District had offered to keep B.D.S. at Gersh during the summer, but, nonetheless, found that "equity [did] not require that [the plaintiffs] . . . suffer the loss of reimbursement for Gersh for the remainder 2017-18 school year simply because they were unwilling to try the program after the [D]istrict failed to deliver services under two successive IEPs."  *Id*.  In any case, as a result of that decision and a later

4

agreement reached between the parties for the 2018-2019 school year, B.D.S. has continuously attend Gersh since 2016.  ECF No. 1-3.

On May 22, 2019, the CSE met to develop B.D.S.'s IEP for the 2019-2020 school year. Ex. D-1.  At the time, B.D.S. was assigned to an "ungraded" 6:1:1 classroom at Gersh that utilized ABA to facilitate skill development.  ECF No. 1-3.  He was also receiving the following: "five 30-minute sessions per week of individual speech-language therapy; three 30-minute sessions per week of individual occupational therapy (OT); two 30-minute sessions per week of individual physical therapy (PT); and the services of a full-time, individual paraprofessional." *Id*. As part of its evaluation, the CSE reviewed a classroom observation completed by the District's Director of Special Education and reports from the District's special education teacher and a speech/language therapist.  Ex. D-1.  The CSE team also heard from a special education teacher from Gersh, the plaintiffs' educational consultant, a speech therapist from Gersh, an occupational therapist and a physical therapist.  *Id.*  In addition, the plaintiffs presented a private neuropsychological evaluation completed on April 19, 2019.  *Id.*

The professionals who testified at the meeting all agreed that while B.D.S. continued to display maladaptive behaviors, to have difficulty with social skills and had begun to engage in new aggressive behaviors, *see* Tr. 540, 690, 806-07, overall B.D.S. was making progress.  Ex. D-1.  For example, the plaintiffs' private neuropsychologist noted that B.D.S. was able to make eye contact and sometimes responded to his name.  *Id.*  His special education teacher stated that with respect to his self-injurious behavior and physical aggression, B.D.S. was responding well to positive reinforcement and breaks with timers.  *Id.*  B.D.S's physical therapist noted that his balance had improved and he had made great gains in core strength.  *Id.*  His special education teacher reported that B.D.S. was able to unpack his belongings and was working on tasks like

packing up his belongings independently, requesting the use of the bathroom, sitting for certain periods of time and toilet training. *Id.* Nonetheless, concerned that B.D.S. might regress if his environment was dramatically shifted, the plaintiffs' private neuropsychologist recommended that B.D.S. remain at Gersh. *Id.* The plaintiffs, their neuropsychologist and the Gersh staff also expressed concern that the District program lacked a full-time BCBA. *See* Tr. 712, 1043.

Despite these stated concerns, the CSE recommended a District based 12-month special class program consisting of a 6:1:3[2] special class placement and the following related services: four 30-minute sessions per week of individual speech-language therapy (therapy room), one 30-minute session per week of individual speech-language therapy (special class), three 30-minute sessions per week of individual OT (therapy room), one 30-minute session per week of individual OT (special class), and two 30-minute sessions per week of individual PT (therapy room). *Id.* According to the District, the recommended program offered B.D.S. an opportunity to interact and play with nondisabled peers in the classroom with support from classroom staff and the District's social worker. *Id.* In addition, the CSE recommended home-based behavior intervention services (two hours per day), home-based parent counseling and training (two hours per week), and school based parent counseling and training (five 60-minute sessions per year) for the 2019-20 school year. *Id.* The recommendation also contemplated a 1:1 aide. *Id.* The plaintiffs wanted the District to continue pay for B.D.S. to attend Gersh so, on July 24, 2019, they filed a due process complaint seeking tuition reimbursement/direct funding for B.D.S. to attend Gersh for the twelve month 2019-2020 school year. Ex. P-A.

Two days after filing the complaint, the plaintiffs visited the District's 6:1:3 class to learn about the program. *Id.; see also* Tr. 453, 883-84. According to the plaintiffs, the District

---

[2] The 6:1:3 program can accommodate a maximum of six special education students and includes one certified special education teacher, three classroom aides and the support and services of a BCBA. Ex. D-1; Tr. 36.

obstructed their efforts to learn about the proposed class by placing them in seats from which their view of the class was obscured.  Tr. 884, 1057.  Nonetheless, the plaintiffs claim that the students in the class appeared older than B.D.S.  Tr. 888.  In addition, the plaintiffs contend that they did not observe any students using verbal language, the students were not appropriately reinforced and the classroom was covered with small objects and manipulatives, which they claim are dangerous for B.D.S. due to his pica.  Tr. 888, 893, 1040, 1052.

Moreover, the plaintiffs argue that the CSE Chairperson, Kim Levy, refused to allow them to view any sample academic data during visit.  Tr. 891, 909-10.  In addition, the plaintiffs claim that during their visit, the District's behavioral consultant, Doreen Ivory, who is not on site regularly, was forced to intervene to correct the staff's improper use of ABA instructional techniques on a number of occasions.  Tr. 332, 890, 1059.  For example, the classroom staff reinforced and rewarded students for engaging in maladaptive and inappropriate behaviors including self-injury and task refusal.  Tr. 1058-59, 1063-64.  Finally, according to the plaintiffs, the classroom staff was not collecting behavior data for any of the students in the class and students were being instructed within small blocked off areas and/or small confined cubicles blocked by a teacher's chair.  Tr. 885-86,889, 1064.

On September 3, 2019, after their visit, the plaintiffs filed an amended due process complaint and demand for a hearing  Ex. P-B.  According to the plaintiff, the District could not even implement its IEP recommendations on the first day of school because the proposed class was still "under construction."  Tr. 886, 905, 1056.   Specifically, four additional cubicles needed to be constructed to replace the "chill  area" contained in the classroom.  *Id.*  In other words, the classroom the plaintiffs had been invited to observe in July was going to be altered.  Tr. 905.  Moreover, on the first day of school, students sat at tables sandwiched between filing cabinets

and the chairs of their instructors, which restricted their movement. Tr. 884.  The plaintiffs note

that B.D.S. requires sensory breaks with movement during the day, and thus, would have been

frustrated in that environment.  Tr. 539, 781, 884-85, 1042.

On January 2, 2020, after holding an extensive impartial hearing encompassing six days

of testimony, 1099 pages of hearing transcripts and 43 exhibits, Impartial Hearing Officer Heidi

Reichel, dismissed the plaintiffs' claims finding that the District had provided B.D.S with an

offer of a FAPE for the 2019-2020 school year.[3]  ECF No. 10-59.  In doing so, IHO Reichel

highlighted that the previous SRO decision in the plaintiffs' favor was based entirely on the fact

that the recommended 6:1:3 class was not going to start until September of 2017.  *Id.*  She noted,

that "[t]he SRO did not find that the CSE's recommendation to place [B.D.S.] in the District's

6:1:3 program for the 10-month 2017-2018 school year was inappropriate for [B.D.S.'s] needs,

that the program itself would not provide [B.D.S.] with a FAPE or that the program would not

provide [B.D.S.] with an appropriate ABA program provided by trained and competent staff."

*Id.*  Indeed, IHO Reichel held:

> There is no evidence that the student would regress if he were to leave Gersh
> and transfer to the District's 6:3:1 program. Although the student has a 12
> month IEP and is now in his fourth year at Gersh, he did not attend Gersh
> during the summers of 2017 or 2018. During those summers he went to camp
> (Tr. 410, 917). There was no mention of regression before, during or after
> camp.  In fact[,] there was no mention of where the camp was, what children
> he was grouped with, whether special steps were taken to help him transition.
> Nothing.

---

[3] The due process hearing was conducted on September 25, September 26, October 3, November 1, November 22, and November 26, 2019.  The plaintiffs offered the testimony of six witnesses Celeste Gagliardi, Gersh's Executive Director; Dr. Anne-Marie Lepore, B.D.S.'s neuropsychologist, Amy Bell, Gersh's BCBA, M.S., Jo Distefano, President of Access 7, and Karen Bottalico, the plaintiff's educational consultant.  *See* Tr. 498-920.  The District presented the three witnesses: Marisa Forster, a certified special education teacher for the District; Doreen Ivory, the District's BCBA, and Kim Levy, the Director of Special Education Services.  *See* Tr.1-496.  After the plaintiffs rested, the District recalled Ms. Ivory for the purpose of offering testimony with respect to the business records regarding her BCBA services to the District that were produced by her agency, Access 7, in response to a subpoena that the Parents had served on Access 7.  *See* Tr. 924.

*Id.* Accordingly, IHO Reichel found that the District had satisfied its burden to establish that the recommended program offered [B.D.S.] a FAPE in the least restrictive environment and was reasonably calculated to enable him to make progress in light of his circumstances.[4] *Id.*

    The plaintiffs appealed the decision to the SRO.  On April 3, 2020, the SRO issued a 51-page decision denying the appeal.  The SRO stated, in pertinent part:

> Having determined that the evidence in the hearing record establishes that the [D]istrict offered [B.D.S.] a FAPE in the LRE for the 2019-20 school year, the necessary inquiry is at an end and there is no need to reach the issue of whether Gersh was an appropriate unilateral placement for the student (see Burlington, 471 U.S. at 370).

ECF No. 12-7.  Although the SRO noted that the IHO had not directly addressed the issue of predetermination or parent participation in the CSE's decision, an issue raised by the plaintiffs in this case,[5] the SRO found that the CSE had reviewed the present levels of performance, the annual goals, and then the ultimate recommendations, and that "[e]veryone had the chance to be heard." *Id.*

    According to the record, despite the SRO's decision, the plaintiffs chose to have B.D.S. remain at Gersh for the 2019-2020 school year.  Tr. 778, 897.  In order for him to do so, the plaintiffs were required to execute a parental guarantee of tuition.  Ex. P-B.  Although it is not clear from the record what the parents were required to pay in 2019-2020, the total cost for B.D.S.'s tuition and related service for the 2017-2018 school year had been $110,900.  *Id.*  The plaintiffs report that B.D.S. continues to make progress at Gersh and has displayed a significant reduction in off-task and self-injurious behaviors.  Exs. P-F, P-U, P-X; Tr. 129, 460-61, 520-21,

---

[4] IHO Reichel also rejected the plaintiffs' claim that proposed IEP was procedurally defective.  ECF No. 10-59.
[5] The plaintiffs argue that at the end of the CSE meeting, prior to any placement discussion, the CSE Chairperson, Kim Levy, unilaterally recommended the District's 6:1:3 class for B.D.S. and refused to consider continuing his placement at Gersh or a similar program with 1:1 ABA instruction and full-time BCBA support.  Pls.' Mem. at 4.

678, 683-84, 686-87, 774, 778, 856, 1038.

## DISCUSSION

### A.    Standards of Law

Summary judgment is proper only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue of fact is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'  A fact is material if it 'might affect the outcome of the suit under the governing law.'"  *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In determining whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion."  *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir. 1995) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (*per curiam*)); *see Dickerson v. Napolitano*, 604 F.3d 732, 740 (2d Cir. 2010) (same).

Once the moving party has met its burden, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)); *see also Wright v. Goord,* 554 F.3d 255, 266 (2d Cir. 2009).  The nonmoving party cannot survive summary judgment by casting mere "metaphysical doubt" upon the evidence produced by the moving party.  *Matsushita*, 475 U.S. at 586.  Summary judgment is appropriate when the moving party can show that "little or no evidence may be found in support of the nonmoving party's case."  *Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1223-24 (2d Cir. 1994) (citations omitted).  However, "the judge's role in reviewing a motion for summary judgment is not to

weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo*, 22 F.3d at 1224.

IDEA appeals are frequently resolved by cross-motions designated as motions for summary judgment. While the parties in an IDEA actions call the procedure 'a motion for summary judgment,' the procedure is in substance an appeal from an administrative determination. *See M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 226 (2d Cir. 2012). Pursuant to the IDEA, "a district court must conduct an independent review of the administrative record" and "determine by a preponderance of the evidence whether the IDEA's provisions have been met." *D.A.B. v. N Y.C. Dept. of Educ.*, 973 F. Supp. 2d 344, 350 (S.D.N.Y. 2013). The "preponderance of the evidence" standard comes directly from the IDEA itself. 20 U.S.C. § 1415(i)(2)(C). However, "[i]n reviewing the administrative proceedings, it is critical to recall that IDEA's statutory scheme requires substantial deference to state administrative bodies on matters of educational policy." *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 191 (2d Cir. 2005). The Court's independent review of the administrative record is "by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Id.*; *see also Gagliardo v. Arlington Cent. Sch. Dist.,* 489 F.3d 105, 112–13 (2d Cir. 2007). Accordingly*,* "[w]hile federal courts do not simply rubber stamp administrative decisions, they are expected to give due weight to these proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998) (internal citations omitted).

11

### B.    The Statutory Scheme

The IDEA was enacted by Congress to promote the education of handicapped children. *Id.* at 122.  To further that goal, Congress provides federal funds to states that develop plans to assure all children with disabilities the right to a free appropriate public education.  20 U.S.C. §1412(a)(1)(A). [6] The FAPE mandated by federal law must include "special education and related services" tailored to meet the unique needs of a particular child, 20 U.S.C. § 1401(9), and be reasonably calculated to enable the child to receive educational benefits.  *See Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley,* 458 U.S. 176, 207 (1982).

The particular educational needs of a disabled child and the services necessary to meet those needs must be set forth at least annually in a written IEP.  *See Walczak,* 142 F.3d at 122 (citing 20 U.S.C. § 1414(a)(5))(renumbered § 614(d)(4)).  Parents who are not satisfied with a proposed IEP may file a complaint with the state educational agency.  *See* 20 U.S.C. §1415(B)(1)(E).  In addition, parents who believe that a District is not providing their child with a FAPE may, at their own financial risk, enroll that child in an appropriate private school and retroactively seek reimbursement for the cost of private school.  *D.A.B. v. N.Y.C. Dept. of Educ.*, 973 F. Supp. 2d 344, 349-50 (S.D.N.Y. 2013).  In any case, complaints filed with the state educational agency are resolved through an impartial due process hearing, 20 U.S.C. § 1415(b)(2) [(now §1415(f)], at which school authorities have the burden of supporting the proposed IEP.  *See Matter of the Application of a Handicapped Child,* 22 Educ. Dep't Rep. 487, 489 (1983) ("It is well established that a board of education has the burden of establishing the appropriateness of the placement recommended by [the school board]").  "A local hearing

---

[6]The provisions of the IDEA statute have been renumbered many times and thus, provisions set forth in case citations may not reflect current numbering.

officer's decision may be appealed to the state educational agency, *see* 20 U.S.C. § 1415(c) [(now § 1415(g)], after which any party still aggrieved may sue in either state or federal court, *see* 20 U.S.C. § 1415(e)(2) [(now § 1415(i)(2)]. *Walczak,* 142 F.3d at 122. With these standards in mind, the Court turns to the parties' arguments.

### C.    The Plaintiffs' Challenges

As indicated above, the plaintiffs in this action unilaterally placed B.D.S. in Gersh and are now seeking retroactive tuition reimbursement from the District on the ground that the proposed IEP would not have provided B.D.S. with a FAPE. *See* 20 U.S.C. § 1412(a)(10)(C). In order to determine if the plaintiffs are entitled to reimbursement, the Court must apply the well-established three-part *Burlington/Carter* test. *See T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 152 (2d Cir. 2014). First, the Court must determine whether the District's proposed placement violated the IDEA. *Id.* If the Court finds that is has, the Court considers next whether the parents' alternative private placement was appropriate. *Id.* Finally, the Court considers whether the equities favor reimbursement. *Id.* "Under the first prong of the Burlington/Carter test, there is a "two-part inquiry" for reviewing administrative determinations as to the provision of a FAPE." *W.S. v. City Sch. Dist. of the City of New York*, 188 F. Supp. 3d 293, 304 (S.D.N.Y. 2016) (citing *R.C. ex rel. M.C. v. Byram Hills Sch. Dist.*, 906 F. Supp. 2d 256, 267-8 (S.D.N.Y. 2012)). "First, the reviewing court determines whether 'the State complied with the procedures set forth' by the IDEA; second, the court determines whether the IEP 'developed through the Act's procedures was reasonably calculated to enable the child to receive educational benefits.'" *Id.*

### 1.    The Alleged Procedural Violations

"A procedural error will only render an IEP legally inadequate if the alleged

inadequacies, '(i) impeded the child's right to a [FAPE]; (ii) significantly impeded the parents' opportunity to participate in the decision making process regarding the provision of a [FAPE] to the parents' child; or (iii) caused a deprivation of benefits.'" *R.C. ex rel. M.C.,* 906 F. Supp. 2d at 268 (citing 20 U.S.C. § 1415(f)(3)(E)(ii)).  In this case, the plaintiffs argue that they were not given an opportunity to participate in the decision making process because the CSE's Chairperson, Kim Levy ("Levy"), was determined to place B.D.S. in the District's 6:1:3 program for 2019-2020 school year.  Particularly, the plaintiffs claim that while Levy allowed others to express their concerns about the 6:1:3 class during the CSE meeting, she was not truly open to any options other than the District's own program.

The Court has reviewed the administrative record with regard to this issue and finds nothing to suggest that the development of the IEP was procedurally deficient.  In fact, the plaintiffs' contention that the proposed placement was predetermined is entirely unsupported.  As stated above, as part of its evaluation, the CSE reviewed a classroom observation completed by the District's Director of Special Education as well as reports from the District's special education teacher and a speech/language therapist.  Ex. D-1.  The CSE team also heard from a special education teacher from Gersh, the plaintiffs' educational consultant, a speech therapist from Gersh, an occupational therapist and a physical therapist.  *Id.*  In addition, the CSE considered a private neuropsychological evaluation offered by the plaintiffs, which recommended continuation at Gersh where B.D.S. was making progress.  *Id.*  Finally, the CSE considered the results of numerous tests administered in April 2017 and several written reports including, a current IEP progress report, a behavioral intervention plan, an educational annual review progress report, a functional behavioral assessment, an occupational therapy progress summary, a speech/language progress summary, a physical therapy progress summary, a

neuropsychological evaluation prepared by Dr. Lepore and a classroom observation. *Id.* Notwithstanding the plaintiffs' claim that the District disregarded their expert's recommendations, both the IHO and the SRO concluded that "the May 2019 CSE reviewed the present levels of performance, the annual goals, and then the ultimate recommendations, and moreover, that '[e]veryone had the chance to be heard.'" ECF No. 1-3.

Courts in this district "have repeatedly rejected predetermination claims where, . . . the parents actively and meaningfully participated in the development of the IEP." *D.D-S. v. Southold Union Free Sch. Dist.*, No. 09-CV-5026 JS WDW, 2011 WL 3919040, at *11 (E.D.N.Y. Sept. 2, 2011), aff'd, 506 F. App'x 80 (2d Cir. 2012). Here, the IHO found no merit in the plaintiffs' education consultant's testimony that the May 2019 CSE meeting was a "contentious[,] dismissive meeting." In fact, according to the IHO, the "audio recording of the CSE meeting," to which she listened several times, impugned [the educational consultant's] testimony to such a degree that it caused her to lose all credibility in this case." *Id.* The IHO also noted that "[o]ther testimony lessened her credibility as well." *Id.* Indeed, if anything, the record in this case suggests that it was the plaintiffs who were predetermined to have B.D.S. remain at Gersh at the District's expense. **See** ECF No. 10-59. The IHO noted, to this end, that:

> [t]he main issue here is that the parents want [t]he District to pay for their son to remain at Gersh . . ., which The New York State Commissioner of Education has not approved as a school with which school districts may contract to instruct students with disabilities (see 8 NYCRR 200.l[d], 200.7). The [p]arents described reasons by which the District's proposed IEP was procedurally and substantively defective in their Due Process Notice. . . . None of the reasons that the [p]arents put forth would lead me to rule that the IEP was defective, as those reasons were either; irrelevant, misleading, untrue, unsupported by the record or antithetical to the IDEA . . ..

*Id.* The IHO further indicated that the plaintiffs had immediately rejected the proposed 6:3:1 program, heavily relying on the 2018 decision in their favor that found the brand new 6:3:1

program to be insufficient for the 2017-18 school year.  However, the IHO concluded that the 2018 SRO determination was based, in part, on the fact that the program would not be available for the summer of 2017 and B.D.S. required placement in a 12-month program.

Similarly, while the SRO found that the IHO decision would have benefitted from additional detail, the SRO was quick to note that "the IHO did find that, based upon listening to both the parents' and the District's audio recordings of the May 2019 CSE meeting "three times," the "CSE chairperson, .  .. , held a very collegial and cooperative, one might say textbook, CSE meeting." ECF No. 12-7.  The SRO further noted, and the undersigned agrees, "that the evidence in the hearing record demonstrates that . . . the May 2019 CSE reviewed the present levels of performance, the annual goals, and then the ultimate recommendations, and moreover, that "[e]veryone had the chance to be heard." *Id.*

Nevertheless, the plaintiffs also contend that the District committed a procedural violation by failing to conduct a Functional Behavior Analysis ("FBA") or to develop a Behavior Invention Plan ("BIP").  To this end, New York State regulations require that a "student's need for a behavioral intervention plan shall be documented on the IEP and such plan shall be reviewed at least annually by the CSE." 8 NYCRR 200.22(b)(2).  An FBA provides an "identification of [a disabled student's] problem behavior, the definition of the behavior in concrete terms, the identification of the contextual factors that contribute to the behavior . . . and the formulation of a hypothesis regarding the general conditions under which a behavior usually occurs and probable consequences that serve to maintain it." *M.W. ex rel. S.W. v. New York City Dep't of Educ.,* 725 F.3d 131, 139 (2d Cir. 2013) (citing N.Y. Comp. Codes R. & Regs. tit. 8 § 200.1(r)).  Similarly, the IDEA requires that for a child whose behavior impedes that child's learning or the learning of others, the CSE must "consider the use of positive behavioral

16

interventions and supports, and other strategies, to address that behavior." 20 USC $ 1414(d)(3)(B)(i); see also 34 CFR 300.324(a)(2)(i); 8 NYCRR 200.4(d)(3)(i).  However, pursuant to the IDEA, an IEP developed without an FBA does not compel the conclusion that the IEP was legally inadequate.  *Id.* (citing *A.C. ex rel. M.C. v. Bd. of Educ. of The Chappaqua Cent. Sch. Dist.,* 553 F.3d 165, 172 n.1 (2d Cir. 2009)).

 In this case, the IEP clearly states that B.D.S. requires positive behavioral intervention and has a BIP in place '[t]o target off task/escape, self-injurious, and physical aggression behaviors through proactive strategies and reinforcing replacement behaviors." Ex. D-1. Those targeted behaviors were identified in B.D.S.'s BIP prepared at Gersh one month before the CSE convened in May.  Ex. P-Q, P-R, Tr. 816-832.  While the CSE did not conduct a new FBA or prepare a new BIP, it was provided with a copy of the Gersh FBA and BIP and, during the CSE meeting, the Gersh special education teacher reviewed the BIP in detail.  Tr. 559-563. Moreover, it is clear that the IEP recognized that B.D.S. needed behavioral intervention in "an ABA setting with the use of ABA strategies, including discrete trial instruction, a token economy to learn" and "sensory breaks" throughout the day to decrease frustration.  Ex. D-1.  Accordingly, the undersigned finds no basis to overturn the SRO's decision rejecting the plaintiffs' claim that the CSE should have conducted their own FBA and BIP rather than rely on the Gersh FBA and BIP, which were prepared only one month earlier.

 **2.** **Compliance with the Substantive Requirements**

 Turning to the adequacy of the IEP, the plaintiffs argue that the May 2019 IEP would not have provided B.D.S. with an opportunity to progress.  *See W.S.*, 188 F. Supp. 3d at 304 (citing T.*P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 254 (2d Cir. 2009) ("[t]o fulfill the requirements of federal law, an IEP must be 'likely to produce progress, not

regression,' and must afford [a] student 'an opportunity greater than mere trivial advancement'"))  The main thrust of their argument is that B.D.S. required intensive ABA instruction and the proposed program did not include "appropriate instruction, support and supervision from a BCBA." *See* Ex. D-1; Tr. 1007-08.  The plaintiffs contend, in this regard, that when they visited the 6:3:1 class, they saw several staff members improperly using ABA instructional techniques.  They concluded, therefore, that B.D.S. would be deprived of a FAPE because the District's BCBA, who could correct those techniques, was not always on site.  Tr. 332, 890, 1059.  These contentions are without merit.  To begin with, it is clear from the record that the District's 6:3:1 program is designated as an intense ABA program.  In addition, as the plaintiffs' arguments reflect, the District does employ a behavioral consultant, Doreen Ivory, who "consults with and trains the program staff and works on programs with student."  Ex. D-1.  While both sides agree that B.D.S. requires ABA instruction, nothing in the record suggests that such instruction has to be delivered by a BCBA in order to be effective.  ECF No. 12-7.

The plaintiffs also argue that the annual goals in the May 2019 IEP were not appropriate.  Specifically, they contend that the CSE simply copied the annual goals from a Gersh progress report but that those goals were specifically designed to be implemented in Gersh's intensive 1:1 ABA program.  They claim, therefore, that the goals could not have been properly implemented in the District's 6:l:3 intensive needs class.  This argument also lacks merit.  The hearing record makes clear that the CSE discussed and revised B.D.S.'s annual goals after receiving input from all of the CSE members, Gersh providers, the plaintiffs, and the plaintiffs' educational consultant. Exs. D-1, D-16, P-F, P-M to P-S, P-X and P-AA.  In fact, while B.D.S.'s goals from Gersh may have been a starting point, the SRO noted that the audio recordings of the May 2019 CSE meeting evidenced collaboration between all members of the CSE in reviewing and revising

the annual goals for B.D.S. until all of those members were satisfied with the language of the annual goals, as well as the specific skills targeted by the annual goals.  ECF No. 12-7.

The record also reflects that while the district failed to specifically reference BCBA services in the IEP, it was clear to everyone in attendance at the CSE meeting that BCBA services was an integral component of both the District's and Gersh's programs.  In any case, the IEP included 19 annual goals and 38 short-term objectives targeting B.D.S.'s needs in the areas of reading, mathematics, speech-language, social/emotional and behavioral, motor skills, and daily living skills.  Ex D-1.  To help B.D.S. achieve those goals, the proposed program provided 1:1 discrete trial teaching on a daily basis, which, contrary to the plaintiffs' contentions, included appropriate data collection.  Tr. 64-5; 168; 265-77.  Teacher in the 6:3:1 classroom use visuals, token economy, "first-then" techniques, schedules, program books, sensory integration and social skills.  *Id.*  The District further expected that students in the program would be given individualized visual work schedules for their daily discrete trial instruction.  Tr. 73-8.  The program also contemplated that each student would receive, among other things, an individualized reinforcement plan as well as program books that included data collection and graphing.  Tr. 93-109, 142-43.  Finally, the District BCBA trains classroom staff on maintaining daily behavior progress monitoring data.  Tr. 65, 328.  Thus, there is nothing in the record to suggest that the goals set forth in the IEP were deficient.

Nonetheless, the plaintiffs also argue that B.D.S. would not have been appropriately grouped with similar peers in the District's 6:1:3 classroom.[7]  To this end, they claim that school districts are required to place students with disabilities in classes with peers of "similar

---

[7] The plaintiffs also argue that the District's desire to provide B.D.S. access to nondisabled students should not have been considered because B.D.S. was not developmentally ready for that interaction. Ex. PAA; D-16.  In fact, the principal at Gersh opined that B.D.S. might regress if he was introduced to nondisabled peers.  *Id.*

individual needs" who are within 36 months of age.  *See* 8 N.Y.C.R.R. § 200.6(h).  According to

the plaintiffs, B.D.S. would have been placed in a class with a 39 month range; he would have

been the only student in the class with a 1:1 aide; and he would have been one of two verbal

students in the class.  Pls.' Mem. 18.  However, the record is clear that the District received an

age variance for the 36-month limit from the New York State Education Department on July 31,

2016.[8]  In addition, the class profile provided to the plaintiffs reflected that the other students

recommended for the program had substantially similar needs.  Exs. D-14, D-16, Tr. 439-43.

Finally, the Court turns to the plaintiffs' contention that moving B.D.S. to a District

program would have been a mistake given the remarkable progress he was making at Gersh.

ECF No. 12-7 (citing Ex. P-AA, Ex. D-16).  While this argument is included in a long list of

alleged procedural and substantive contentions, the plaintiffs' concern that B.D.S. might have

regressed if his program was "abruptly" changed appears to be driving this litigation.  As the

SRO clearly summarized:

> Both parents commented about removing the student from Gersh in order to
> place him in the district's program as a basis for disagreeing with the May 2019
> CSE's 6:1+3 special class placement recommendation.  The student's mother
> opined that regardless of where the district's program was located-because the
> special class program was moving from one district school building to another
> district school building-would be horrible for the student, characterizing the
> district's program as still in a state of flux in light of the anticipated change in
> location.  The student's mother indicated that moving the student to the
> district's program would result in the student engaging in more self-injurious
> behaviors and would, overall, not meet his needs.  The student's father
> expressed similar reasons for disagreeing with the CSE's recommendation,
> focusing primarily on not interfering with the progress the student had made at
> Gersh and that it would be silly to move him from that program.  The student's
> father also stated at the May 2019 CSE meeting that they respectfully
> disagreed with the CSE's recommendation, and the student would stay at Gersh
> because the CSE bad no substantial reason for removing the student from a
> program where he had made substantial progress.

---

[8] As the District correctly notes, nothing in the regulations require that the District obtain the variance in advance of the CSE meeting.  *See* D-15.

*Id.* (internal citations omitted).  The plaintiffs' fear that B.D.S. would have regressed had he been moved to the District program is simply not a basis on which to overturn the SRO's conclusion that the District had offered B.D.S. a FAPE for the 2019-2020 school year.

      **3.**      **The Remaining *Burlington/Carter* Analysis.**

Having determined that there is no basis to overturn the SRO's determination that the District offered B.D.S. a FAPE for the 2019-2020 school year, the undersigned need not address whether the parents' alternative private placement was appropriate or if the equities favor reimbursement.  Accordingly, the undersigned respectfully recommends that the defendant's motion for summary judgment be granted and the plaintiffs' motion for summary judgment be denied.

## OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections.  Any requests for an extension of time for filing objections must be directed to Judge Azrack prior to the expiration of the fourteen (14) day period for filing objections. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Beverly v. Walker*, 118 F.3d 900, 901 (2d Cir. 1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).


Dated:  Central Islip, New York
        February 3, 2022

                                      _____/s/_____
                                        Arlene R. Lindsay
                                        United States Magistrate Judge